*250 Justice Sotomayor,
with whom Justice Ginsburg joins,
dissenting.
Vaccine manufacturers have long been subject to a legal duty, rooted in basic principles of products liability law, to improve the designs of their vaccines in light of advances in science and technology. Until today, that duty was enforceable through a traditional state-law tort action for defective design. In holding that § 22(b)(1) of the National Childhood Vaccine Injury Act of 1986 (Vaccine Act or Act), 42 U. S. C. § 300aa-22(b)(l), pre-empts all design defect claims for injuries stemming from vaccines covered under the Act, the Court imposes its own bare policy preference over the considered judgment of Congress. In doing so, the Court excises 13 words from the statutory text, misconstrues the Act's legislative history, and disturbs the careful balance Congress struck between compensating vaccine-injured children and stabilizing the childhood vaccine market. Its decision leaves a regulatory vacuum in which no one ensures that vaccine manufacturers adequately take account of scientific and technological advancements when designing or distributing their products. Because nothing in the text, structure, or legislative history of the Vaccine Act remotely suggests that Congress intended such a result, I respectfully dissent.
I
A
Section 22 of the Vaccine Act provides “ [standards of responsibility” to govern civil actions against vaccine manufacturers. 42 U. S. C. § 300aa-22. Section 22(a) sets forth the “[gjeneral rule” that “State law shall apply to a civil action brought for damages for a vaccine-related injury or death.” § 300aa-22(a). This baseline rule that state law applies is subject to three narrow exceptions, one of which, § 22(b)(1), is at issue in this case. Section 22(b)(1) provides:
*251 “No vaccine manufacturer shall be liable in a civil action for damages arising from a vaccine-related injury or death associated with the administration of a vaccine after October 1, 1988, if the injury or death resulted from side effects that were unavoidable even though the vaccine was properly prepared and was accompanied by proper directions and warnings.” § 300aa-22(b)(1).
The provision contains two key clauses: “if the injury or death resulted from side effects that were unavoidable” (the “if” clause), and “even though the vaccine was properly prepared and was accompanied by proper directions and warnings” (the “even though” clause).
Blackletter products liability law generally recognizes three different types of product defects: design defects, manufacturing defects, and labeling defects (e.g., failure to warn).[1] The reference in the “even though” clause to a “properly prepared” vaccine “accompanied by proper directions and warnings” is an obvious reference to two such defects — manufacturing and labeling defects. The plain terms of the “even though” clause thus indicate that § 22(b)(1) applies only where neither kind of defect is present. Because § 22(b)(1) is invoked by vaccine manufacturers as a defense to tort liability, it follows that the “even though” clause requires a vaccine manufacturer in each civil action to demonstrate that its vaccine is free from manufacturing and labeling defects to fall within the liability exemption of § 22(b)(1).[2]
Given that the “even though” clause requires the absence of manufacturing and labeling defects, the “if” clause’s reference to “side effects that were unavoidable” must refer to *252 side effects caused by something other than manufacturing and labeling defects. The only remaining kind of product defect recognized under traditional products liability law is a design defect. Thus, “side effects that were unavoidable” must refer to side effects caused by a vaccine’s design that were “unavoidable.” Because §22(b)(1) uses the conditional term “if,” moreover, the text plainly implies that some side effects stemming from a vaccine’s design are “unavoidable,” while others are avoidable. See Webster’s Third New International Dictionary 1124 (2002) (“if” means “in the event that,” “so long as,” or “on condition that”). Accordingly, because the “if” clause (like the “even though” clause) sets forth a condition to invoke § 22(b)(l)’s defense to tort liability, Congress must also have intended a vaccine manufacturer to demonstrate in each civil action that the particular side effects of a vaccine’s design were “unavoidable.”
Congress’ use of conditional “if” clauses in two other provisions of the Vaccine Act supports the conclusion that § 22(b)(1) requires an inquiry in each case in which a manufacturer seeks to invoke the provision’s exception to state tort liability. In § 22(b)(2), Congress created a presumption that, for purposes of § 22(b)(1), “a vaccine shall be presumed to be accompanied by proper directions and warnings if the vaccine manufacturer shows that it complied in all material respects with” federal labeling requirements. 42 U. S. C. § 300aa-22(b)(2). Similarly, in § 23(d)(2), Congress created an exemption from punitive damages “[i]f . . . the manufacturer shows that it complied, in all material respects,” with applicable federal laws, unless it engages in “fraud,” “intentional and wrongful withholding of information” from federal regulators, or “other criminal or illegal activity.” §300aa-23(d)(2). It would be highly anomalous for Congress to use a conditional “if” clause in §§ 22(b)(2) and 23(d)(2) to require a specific inquiry in each case while using the same *253 conditional “if” clause in § 22(b)(1) to denote a categorical exemption from liability. Cf. Erlenbaugh v. United States, 409 U. S. 239, 243 (1972) (“[A] legislative body generally uses a particular word with a consistent meaning in a given context”).
Indeed, when Congress intends to pre-empt design defect claims categorically, it does so using categorical (e. g., “all”) and/or declarative language (e. g., “shall”), rather than a conditional term (“if”). For example, in a related context, Congress has authorized the Secretary of Health and Human Services to designate a vaccine designed to prevent a pandemic or epidemic as a “covered countermeasure.” 42 U. S. C. §§247d-6d(b), (i)(1), (i)(7)(A)(i). With respect to such “covered countermeasure[s],” Congress provided that subject to certain exceptions, “a covered person shall be immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure,” §247d-6d(a)(1) (emphasis added), including specifically claims relating to “the design” of the countermeasure, § 247d-6d(a)(2)(B).
The plain text and structure of the Vaccine Act thus compel the conclusion that § 22(b)(1) pre-empts some — but not all — design defect claims. Contrary to the majority’s and respondent’s categorical reading, petitioners correctly contend that, where a plaintiff has proved that she has suffered an injury resulting from a side effect caused by a vaccine’s design, a vaccine manufacturer may invoke § 22(b)(1)’s liability exemption only if it demonstrates that the side effect stemming from the particular vaccine’s design is “unavoidable,” and that the vaccine is otherwise free from manufacturing and labeling defects.[3]
*254 B
The legislative history confirms petitioners’ interpretation of § 22(b)(1) and sheds further light on its pre-emptive scope. The House Energy and Commerce Committee Report accompanying the Vaccine Act, H. R. Rep. No. 99-908, pt. 1 (1986) (hereinafter 1986 Report), explains in relevant part:
“Subsection (b) — Unavoidable Adverse Side Effects; Direct Warnings. — This provision sets forth the principle contained in Comment k of Section 402A of the Restatement of Torts (Second) that a vaccine manufacturer should not be liable for injuries or deaths resulting from unavoidable side effects even though the vaccine was properly prepared and accompanied by proper directions and warnings.
“The Committee has set forth Comment K in this bill because it intends that the principle in Comment K regarding 'unavoidably unsafe’ products, i. e., those products which in the present state of human skill and knowledge cannot be made safe, apply to the vaccines covered in the bill and that such products not be the subject of liability in the tort system.” Id., at 25-26.
The 1986 Report expressly adopts comment k of §402A of the Restatement of Torts (Second) (1963-1964) (hereinafter Restatement), which provides that “unavoidably unsafe” products — i. e., those that “in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use” — are not defective.[4] As “[a]n *255 outstanding example” of an “Unavoidably unsafe” product, comment k cites “the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected”; “[s]ince the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve.” Id., at 353. Comment k thus provides that “seller [s]” of “Unavoidably unsafe” products are “not to be held to strict liability” provided that such products “are properly prepared and marketed, and proper warning is given.” Ibid.
As the 1986 Report explains, Congress intended that the “principle in Comment K regarding ‘unavoidably unsafe’ products” apply to the vaccines covered in the bill. 1986 Report 26. That intent, in turn, is manifested in the plain text of § 22(b)(1) — in particular, Congress’ use of the word “unavoidable,” as well as the phrases “properly prepared” and “accompanied by proper directions and warnings,” which were taken nearly verbatim from comment k. 42 U. S. C. § 300aa-22(b)(l); see Restatement 353-354 (“Such a[n unavoidably unsafe] product, properly prepared, and accompa *256 nied by proper directions and warning, is not defective”). By the time of the Vaccine Act’s enactment in 1986, numerous state and federal courts had interpreted comment k to mean that a product is “unavoidably unsafe” when, given proper manufacture and labeling, no feasible alternative design would reduce the safety risks without compromising the product’s cost and utility.[5] Given Congress’ expressed in *257 tent to codify the “principle in Comment K,” 1986 Report 26, the term “unavoidable” in § 22(b)(1) is best understood as a term of art, which incorporates the commonly understood meaning of “unavoidably unsafe” products under comment k at the time of the Act's enactment in 1986. See McDermott Int’l, Inc. v. Wilander, 498 U. S. 337, 342 (1991) (“[W]e assume that when a statute uses ... a term [of art], Congress intended it to have its established meaning”); Morissette v. United States, 342 U. S. 246, 263 (1952) (same).[6] Similarly, courts applying comment k had long required manufacturers invoking the defense to demonstrate that their products were not only “unavoidably unsafe” but also properly manufactured and labeled.[7] By requiring “prope[r] preparation]” and “proper directions and warnings” in § 22(b)(1), Congress plainly intended to incorporate these additional comment k requirements.
The 1986 Report thus confirms petitioners' interpretation of § 22(b)(1). The 1986 Report makes clear that “side effects that were unavoidable” in § 22(b)(1) refers to side effects stemming from a vaccine's design that were “unavoidable.” By explaining what Congress meant by the term “unavoid *258 able,” moreover, the 1986 Report also confirms that whether a side effect is “unavoidable” for purposes of § 22(b)(1) involves a specific inquiry in each case as to whether the vaccine “in the present state of human skill and knowledge cannot be made safe,” 1986 Report 26 — i. e., whether a feasible alternative design existed that would have eliminated the adverse side effects of the vaccine without compromising its cost and utility. See Brief for Kenneth W. Starr et al. as Amici Curiae 14-15 (“If a particular plaintiff could show that her injury at issue was avoidable ... through the use of a feasible alternative design for a specific vaccine, then she would satisfy the [plain] language of the statute, because she would have demonstrated that the side effects were not unavoidable”). Finally, the 1986 Report confirms that the “even though” clause is properly read to establish two additional prerequisites — proper manufacturing and proper labeling — to qualify for § 22(b)(l)’s liability exemption.[8]
*259 In addition to the 1986 Report, one other piece of the Act’s legislative history provides further confirmation of the petitioners’ textual reading of § 22(b)(1). When Congress enacted the Vaccine Act in 1986, it did not initially include a source of payment for the no-fault compensation program the Act established. The Act thus “made the compensation program and accompanying tort reforms contingent on the enactment of a tax to provide funding for the compensation.” 1987 Report 690. In 1987, Congress passed legislation to fund the compensation program. The House Energy and Commerce Committee Report[9] accompanying that legislation specifically stated that “the codification of Comment (k) of The Restatement (Second) of Torts was not intended to decide as a matter of law the circumstances in which a vaccine should be deemed unavoidably unsafe.” Id., at 691. The Committee noted that “[a]n amendment to establish . .. that a manufacturer’s failure to develop [a] safer vaccine was not grounds for liability was rejected by the Committee dur *260 ing its original consideration of the Act.” Ibid. In light of that rejection, the Committee emphasized that “there should be no misunderstanding that the Act undertook to decide as a matter of law whether vaccines were unavoidably unsafe or not,” and that “[t]his question is left to the courts to determine in accordance with applicable law.” Ibid.
To he sure, postenactment legislative history created by a subsequent Congress is ordinarily a hazardous basis from which to infer the intent of the enacting Congress. See Sullivan v. Finkelstein, 496 U. S. 617, 631-632 (1990) (Scalia, J., concurring in part). But unlike ordinary postenactment legislative history, which is justifiably given little or no weight, the 1987 Report reflects the intent of the Congress that enacted the funding legislation necessary to give operative effect to the principal provisions of the Vaccine Act, including § 22(b)(1).[10] Congress in 1987 had a number of options before it, including adopting an entirely different compensation scheme, as the Reagan administration was proposing;[11] establishing different limitations on tort liability, including ehminating design defect liability, as pharmaceutical industry leaders were advocating;[12] or not funding the *261 compensation program at all, which would have effectively nullified the relevant portions of the Act. Because the tort reforms in the 1986 Act, including § 22(b)(1), had no operative legal effect unless and until Congress provided funding for the compensation program, the views of the Congress that enacted that funding legislation are a proper and, indeed, authoritative guide to the meaning of § 22(b)(1). Those views, as reflected in the 1987 Report, provide unequivocal confirmation of petitioners’ reading of § 22(b)(1).
In sum, the text, structure, and legislative history of the Vaccine Act are fully consistent with petitioners’ reading of § 22(b)(1). Accordingly, I believe § 22(b)(1) exempts vaccine manufacturers from tort liability only upon a showing by the manufacturer in each case that the vaccine was properly manufactured and labeled, and that the side effects stemming from the vaccine’s design could not have been prevented by a feasible alternative design that would have eliminated the adverse side effects without compromising the vaccine’s cost and utility.
II
In contrast to the interpretation of § 22(b)(1) set forth above, the majority’s interpretation does considerable violence to the statutory text, misconstrues the legislative history, and draws the wrong conclusions from the structure of the Vaceine Act and the broader federal scheme regulating vaccines.
*262 A
As a textual matter, the majority’s interpretation of § 22(b)(1) is fundamentally flawed in three central respects. First, the majority’s categorical reading rests on a faulty and untenable premise. Second, its reading functionally excises 13 words from the statutory text, including the key term “unavoidable.” And third, the majority entirely ignores the Vaccine Act’s default rule preserving state tort law.
To begin, the majority states that “[a] side effect of a vaccine could always have been avoidable by use of a differently designed vaccine not containing the harmful element.” Ante, at 232. From that premise, the majority concludes that the statute must mean that “the design of the vaccine is a given, not subject to question in the tort action,” because construing the statute otherwise would render § 22(b)(1) a nullity. Ibid. A tort claimant, according to the majority, will always be able to point to a differently designed vaccine not containing the “harmful element,” and if that were sufficient to show that a vaccine’s side effects were not “unavoidable,” the statute would pre-empt nothing.
The starting premise of the majority’s interpretation, however, is fatally flawed. Although in the most literal sense, as the majority notes, a side effect can always be avoided “by use of a differently designed vaccine not containing the harmful element,” ibid., this interpretation of “unavoidable” would effectively read the term out of the statute, and Congress could not have intended that result. Indeed, § 22(b)(1) specifically uses the conditional phrase “if the injury or death resulted from side effects that were unavoidable,” which plainly indicates that Congress contemplated that there would be some instances in which a vaccine’s side effects are “unavoidable” and other instances in which they are not. See supra, at 252. The majority’s premise that a vaccine’s side effects can always be “avoid[ed] by use of a differently designed vaccine not containing the harmful element,” ante, at 232, entirely ignores the fact that removing the “harmful *263 element” will often result in a less effective (or entirely ineffective) vaccine. A vaccine, by its nature, ordinarily employs a killed or weakened form of a bacteria or virus to stimulate antibody production;[13] removing that bacteria or virus might remove the “harmful element,” but it would also necessarily render the vaccine inert. As explained above, the legislative history of the Yaceine Act and the cases interpreting comment k make clear that a side effect is “unavoidable” for purposes of § 22(b)(1) only where there is no feasible alternative design that would eliminate the side effect of the vaccine without compromising its cost and utility. See supra, at 256. The majority’s premise — that side effects stemming from a vaccine’s design are always avoidable — is thus belied by the statutory text and legislative history of § 22(b)(1). And because its starting premise is invalid, its conclusion — that the design of a vaccine is not subject to challenge in a tort action — is also necessarily invalid.
The majority’s reading suffers from an even more fundamental defect. If Congress intended to exempt vaccine manufacturers categorically from all design defect liability, it more logically would have provided: “No vaccine manufacturer shall be liable in a civil action for damages arising from a vaccine-related injury or death associated with the administration of a vaccine after October 1, 1988, if the vaccine was properly prepared and was accompanied by proper directions and warnings.” There would have been no need for Congress to include the additional 13 words “the injury or death resulted from side effects that were unavoidable even though.” See TRW Inc. v. Andrews, 534 U. S. 19, 31 (2001) (noting “cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall *264 be superfluous, void, or insignificant” (internal quotation marks omitted)).
In Bates v. Dow Agrosciences LLC, 544 U. S. 431 (2005), this Court considered an analogous situation where an express pre-emption provision stated that certain States “ ‘shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.’” Id., at 436 (quoting 7 U. S. C. § 136v(b) (2000 ed.)). The Bates Court stated:
“Conspicuously absent from the submissions by [respondent] and the United States is any plausible alternative interpretation of ‘in addition to or different from’ that would give that phrase meaning. Instead, they appear to favor reading those words out of the statute, which would leave the following: ‘Such State shall not impose or continue in effect any requirements for labeling or packaging.’ This amputated version of [the statute] would no doubt have clearly and succinctly commanded the pre-emption of all state requirements concerning labeling. That Congress added the remainder of the provision is evidence of its intent to draw a distinction between state labeling requirements that are pre-empted and those that are not.” 544 U. S., at 448-449.
As with the statutory interpretation rejected by this Court in Bates, the majority’s interpretation of § 22(b)(1) functionally excises 13 words out of the statute, including the key term “unavoidable.” See Duncan v. Walker, 533 U. S. 167, 174 (2001) (“We are especially unwilling” to treat a statutory term as surplusage “when the term occupies so pivotal a place in the statutory scheme”). Although the resulting “amputated version” of the statutory provision “would no doubt have clearly and succinctly commanded the preemption of all state” design defect claims, the fact “[t]hat *265 Congress added the remainder of the provision” is strong evidence of its intent not to pre-empt design defect claims categorically. Bates, 544 U. S., at 449; see also American Home Prods. Corp. v. Ferrari, 284 Ga. 384, 393, 668 S. E. 2d 236, 242 (2008) (“‘If Congress had intended to deprive injured parties of a long available form of compensation, it surely would have expressed that intent more clearly’ ” (quoting Bates, 544 U. S., at 449)), cert. pending, No. 08-1120.
Strikingly, the majority concedes that its interpretation renders 13 words of the statute entirely superfluous. See ante, at 236 (“The intervening passage (‘the injury or death resulted from side effects that were unavoidable even though’) is unnecessary. True enough”). Nevertheless, the majority contends that “the rule against giving a portion of text an interpretation which renders it superfluous ... applies only if verbosity and prolixity can be eliminated by giving the offending passage, or the remainder of the text, a competing interpretation.” Ibid. According to the majority, petitioners’ reading of § 22(b)(1) renders the “even though” clause superfluous because, to reach petitioners’ desired outcome, “[i]t would suffice to say ‘if the injury or death resulted from side effects that were unavoidable’ — full stop.” Ante, at 237. As explained above, however, the “even though” clause establishes two additional prerequisites— proper manufacturing and proper labeling — to qualify for § 22(b)(l)’s exemption from liability. Contrary to the majority’s contention, then, the “even though” clause serves an important function by limiting the scope of the pre-emption afforded by the preceding “if” clause.[14]
*266 The majority’s only other textual argument is based on the expressio unius, exclusio alterius canon. According to the majority, because blackletter products liability law generally recognizes three different types of product defects, “[i]f all three were intended to be preserved, it would be strange [for Congress] to mention specifically only two” — namely, manufacturing and labeling defects in the “even though” clause — “and leave the third to implication.” Ante, at 232. The majority’s argument, however, ignores that the default rule under the Vaccine Act is that state law is preserved. As explained above, § 22(a) expressly provides that the “[g]eneral rule” is that “State law shall apply to a civil action brought for damages for a vaccine-related injury or death.” 42 U. S. C. § 300aa-22(a). Because § 22(a) already preserves state-law design defect claims (to the extent the exemption in § 22(b)(1) does not apply), there was no need for Congress separately and expressly to preserve design defect claims in § 22(b)(1). Indeed, Congress’ principal aim in enacting § 22(b)(1) was not to preserve manufacturing and labeling claims (those, too, were already preserved by § 22(a)), but rather, to federalize comment A;-type protection for “unavoidably unsafe” vaccines. The “even though” clause simply functions to limit the applicability of that defense. The lack of express language in § 22(b)(1) specifically preserving design defect claims thus cannot fairly be understood as impliedly (and categorically) pre-empting such traditional *267 state tort claims, which had already been preserved by § 22(a).[15]
The majority also suggests that if Congress wished to preserve design defect claims, it could have simply provided that manufacturers would be liable for “defective manufacture, defective directions or warning, and defective design.” Ante, at 233 (internal quotation marks omitted). Putting aside the fact that § 22(a) already preserves design defect claims (to the extent § 22(b)(1) does not apply), the majority’s proposed solution would not have fully effectuated Congress’ intent. As the legislative history makes clear, Congress used the term “unavoidable” to effectuate its intent that the “principle in Comment K regarding 'unavoidably unsafe’ products ... apply to the vaccines covered in the bill.” 1986 Report 26; see also 1987 Report 691. At the time of the Vaccine Act’s enactment in 1986, at least one State had expressly rejected comment k,[16] while many others had not ad *268 dressed the applicability of comment k specifically to vaccines or applied comment k to civil actions proceeding on a theory other than strict liability (e. g., negligence[17]). A statute that simply stated that vaccine manufacturers would be liable for “defective design” would be silent as to the availability of a comment fe-type defense for “unavoidably unsafe” vaccines, and thus would not have fully achieved Congress’ aim of extending greater liability protection to vaccine manufacturers by providing comment k-type protection in all civil actions as a matter of federal law.
B
The majority’s structural arguments fare no better than its textual ones. The principal thrust of the majority’s position is that, since nothing in the Vaccine Act or the FDA's regulations governing vaccines expressly mentions design defects, Congress must have intended to remove issues concerning the design of FDA-licensed vaccines from the tort system. Ante, at 237. The flaw in that reasoning, of course, is that the FDA’s silence on design defects existed long before the Vaccine Act was enacted. Indeed, the majority itself concedes that the “FDA has never even spelled out in regulations the criteria it uses to decide whether a vaccine is safe and effective for its intended use.”[18] Ibid. And yet it is undisputed that prior to the Act, vaccine manufacturers *269 had long been subject to liability under state tort law for defective vaccine design. That the Vaccine Act did not itself set forth a comprehensive regulatory scheme with respect to design defects is thus best understood to mean not that Congress suddenly decided to change course sub silentio and pre-empt a longstanding, traditional category of state tort law, but rather, that Congress intended to leave the status quo alone (except, of course, with respect to those aspects of state tort law that the Act expressly altered). See 1987 Report 691 (“It is not the Committee’s intention to preclude court actions under applicable law. The Committee’s intent at the time of considering the Act . . . was ... to leave otherwise applicable law unaffected, except as expressly altered by the Act”).
The majority also suggests that Congress necessarily intended to pre-empt design defect claims since the aim of such tort suits is to promote the development of improved designs and provide compensation for injured individuals, and the Vaccine Act “provides other means for achieving both effects” — most notably through the no-fault compensation program and the National Vaccine Program. Ante, at 238-239, and nn. 57-60 (citing 42 U. S. C. §§ 300aa-l, 300aa-2(a)(1)-(3), 300aa-3, 300aa-25(b), 300aa-27(a)(1)). But the majority’s position elides a significant difference between state tort law and the federal regulatory scheme. Although the Vaccine Act charges the Secretary of Health and Human Services with the obligation to “promote the development of childhood vaccines” and “make or assure improvements in .,. vaccines, and research on vaccines,” § 300aa-27(a), neither the Act nor any other provision of federal law places a legal duty on vaccine manufacturers to improve the design of their vaccines to account for scientific and technological advances. Indeed, the FDA does not condition approval of a vaccine on it being the most optimally designed among reasonably available alternatives, nor does it (or any other federal entity) ensure that licensed vaccines keep pace with technological and sci *270 entific advances.[19] Rather, the function of ensuring that vaccines are optimally designed in light of existing science and technology has traditionally been left to the States through the imposition of damages for design defects. Cf. Bates, 544 U. S., at 451 (“ ‘[T]he specter of damage actions may provide manufacturers with added dynamic incentives to continue to keep abreast of all possible injuries stemming from use of their product[s] so as to forestall such actions *271 through product improvement’”); Wyeth v. Levine, 555 U. S. 555, 578-579 (2009) (noting that the FDA has “traditionally regarded state law as a complementary form of drug regulation” as “[s]tate tort suits uncover unknown drug hazards and provide incentives for drug manufacturers to disclose safety risks promptly”).[20] The importance of the States’ traditional regulatory role is only underscored by the unique features of the vaccine market, in which there are “only one or two manufacturers for a majority of the vaccines listed on the routine childhood immunization schedule.” Brief for Respondent 55. The normal competitive forces that spur innovation and improvements to existing product lines in other markets thus operate with less force in the vaccine market, particularly for vaccines that have already been released and marketed to the public. Absent a clear statutory mandate to the contrary, there is no reason to think that Congress intended in the vaccine context to eliminate the traditional incentive and deterrence functions served by state tort liability in favor of a federal regulatory scheme providing only carrots and no sticks.[21] See Levine, 555 U. S., at 575 (“The *272 case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there is between them” (internal quotation marks and alteration omitted)).
Ill
In enacting the Vaccine Act, Congress established a carefully wrought federal scheme that balances the competing interests of vaccine-injured persons and vaccine manufacturers. As the legislative history indicates, the Act addressed “two overriding concerns”: “(a) the inadequacy — from both the perspective of vaccine-injured persons as well as vaccine manufacturers — of the current approach to compensating those who have been damaged by a vaccine; and (b) the instability and unpredictability of the childhood vaccine market.” 1986 Report 7. When viewed in the context of the Vaccine Act as a whole, § 22(b)(1) is just one part of a broader statutory scheme that balances the need for compensating vaccine-injured children with added liability protections for vaccine manufacturers to ensure a stable childhood vaccine market.
The principal innovation of the Act was the creation of the no-fault compensation program — a scheme funded entirely through an excise tax on vaccines.[22] Through that program, *273 Congress relieved vaccine manufacturers of the burden of compensating victims of vaccine-related injuries in the vast majority of cases[23] — an extremely significant economic benefit that “functionally creat[es] a valuable insurance policy for vaccine-related injuries.” Reply Brief for Petitioners 10.. The structure and legislative history, moreover, point clearly to Congress’ intention to divert would-be tort claimants into the compensation program, rather than eliminate a longstanding category of traditional tort claims. See 1986 Report 13 (“The Committee anticipates that the speed of the compensation program, the low transaction costs of the system, the no-fault nature of the required findings, and the relative certainty and generosity of the system’s awards will divert a significant number of potential plaintiffs from litigation”). Indeed, although complete pre-emption of tort claims would have eliminated the principal source of the “unpredictability” in the vaccine market, Congress specifically chose not to pre-empt state tort claims categorically. See 42 U. S. C. § 300aa-22(a) (providing as a “[gjeneral rule” that “State law shall apply to a civil action brought for damages for a vaccine-related injury or death”). That decision reflects Congress’ recognition that court actions are essential because they provide injured persons with significant procedural tools — including, most importantly, civil discovery— that are not available in administrative proceedings under the compensation program. See §§300aa-12(d)(2)(E), (d)(3). *274 Congress thus clearly believed there was still an important function to be played by state tort law.
Instead of eliminating design defect liability entirely, Congress enacted numerous measures to reduce manufacturers’ liability exposure, including a limited regulatory compliance presumption of adequate warnings, see §300aa-22(b)(2), elimination of claims based on failure to provide direct warnings to patients, § 300aa-22(e), a heightened standard for punitive damages, § 300aa-23(d)(2), and, of course, immunity from damages for “unavoidable” side effects, §300aa-22(b)(1). Considered in light of the Vaccine Act as a whole, §22(b)(l)’s exemption from liability for unavoidably unsafe vaccines is just one part of a broader statutory scheme that reflects Congress’ careful balance between providing adequate compensation for vaccine-injured children and conferring substantial benefits on vaccine manufacturers to ensure a stable and predictable childhood vaccine supply.
The majority’s decision today disturbs that careful balance based on a bare policy preference that it is better “to leave complex epidemiological judgments about vaccine design to the FDA and the National Vaccine Program rather than juries.” Ante, at 239.[24] To be sure, reasonable minds can disagree about the wisdom of having juries weigh the relative costs and benefits of a particular vaccine design. But whatever the merits of the majority’s policy preference, the decision to bar all design defect claims against vaccine manufacturers is one that Congress must make, not this Court.[25] By *275 construing § 22(b)(1) to pre-empt all design defect claims against vaccine manufacturers for covered vaccines, the majority’s decision leaves a regulatory vacuum in which no one — neither the FDA nor any other federal agency, nor state and federal juries — ensures that vaccine manufacturers adequately take account of scientific and technological advancements. This concern is especially acute with respect to vaccines that have already been released and marketed to *276 the public. Manufacturers, given the lack of robust competition in the vaccine market, will often have little or no incentive to improve the designs of vaccines that are already generating significant profit margins. Nothing in the text, structure, or legislative history remotely suggests that Congress intended that result.
I respectfully dissent.

 W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 695 (5th ed. 1984).

 See Silkwood v. Kerr-McGee Corp., 464 U. S. 238, 255 (1984); Brown v. Earthboard Sports USA, Inc., 481 F. 3d 901, 912 (CA6 2007) (“ ‘[F]ederal preemption is an affirmative defense upon which the defendants bear the burden of proof’ ” (quoting Fifth Third Bank v. CSX Corp., 415 F. 3d 741, 745 (CA7 2005))).

 This leaves the question of what precisely § 22(b)(1) means by “unavoidable” side effects, which I address in the next section.

 Comment k provides as follows:
“Unavoidably unsafe products. There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk *255 which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.” Restatement 353-354.

 See, e. g., Smith ex rel. Smith v. Wyeth Labs., Inc., No. Civ. A 84-2002, 1986 WL 720792, *5 (SD W. Va., Aug. 21, 1986) (“[A] prescription drug is not ‘unavoidably unsafe’ when its dangers can be eliminated through design changes that do not unduly affect its cost or utility”); Kearl v. Lederle Labs., 172 Cal. App. 3d 812, 830, 218 Cal. Rptr. 453, 464 (1985) (“unavoid-ability” turns on “(i) whether the product was designed to minimize — to the extent scientifically knowable at the time it was distributed — the risk inherent in the product, and (ii) the availability ... of any alternative product that would have as effectively accomplished the full intended purpose of the subject product”), disapproved in part by Brown v. Superior Ct., 44 Cal. 3d 1049, 751 P. 2d 470 (1988); Belle Bonfils Memorial Blood Bank v. Hansen, 665 P. 2d 118, 122 (Colo. 1983) (“[Ajpplieability of comment k . . . depends upon the co-existence of several factors,” including that “the product’s benefits must not be achievable in another manner; and the risk must be unavoidable under the present state of knowledge”); see also 1 L. Frumer & M. Friedman, Products Liability §§ 8.07[1]-[2], pp. 8-277 to 8-278 (2010) (comment k applies “only to defects in design,” and there “must be no feasible alternative design which on balance accomplishes the subject product’s purpose with a lesser risk” (internal quotation marks omitted)). To be sure, a number of courts at the time of the Vaccine Act’s enactment had interpreted comment k to preclude design defect claims categorically for certain kinds of products, see Hill v. Searle Labs., 884 F. 2d 1064, 1068 (CA8 1989) (collecting cases), but as indicated by the sources cited above, the courts that had construed comment k to apply on a ease-specific basis generally agreed on the basic elements of what constituted an “unavoidably unsafe” product. See also n. 8, infra. The majority’s suggestion that “judges who must rule on motions to dismiss, motions for summary judgment, and motions for judgment as a matter of law” are incapable of adjudicating claims alleging “unavoidable” side effects, ante, at 232, n. 35, is thus belied by the experience of the many courts that had adjudicated such claims for years by the time of the Vaccine Act’s enactment.

 The majority refuses to reeognize that “unavoidable” is a term of art derived from comment k, suggesting that “ ‘[unavoidable’ is hardly a rarely used word.” Ante, at 235. In fact, however, “unavoidable” is an extremely rare word in the relevant context. It appears exactly once (i. e., in § 300aa-22(b)(1)) in the entirety of Title 42 of the U. S. Code (“Public Health and Welfare”), which governs, inter alia, Social Security, see 42 U. S. C. § 301 et seq., Medicare, see § 1395 et seq., and several other of the Federal Government’s largest entitlement programs. The singular rarity in which Congress used the term supports the conclusion that “unavoidable” is a term of art.

 See, e.g., Brochu v. Ortho Pharmaceutical Corp., 642 F. 2d 652, 657 (CA1 1981); Needham v. White Labs., Inc., 639 F. 2d 394, 402 (CA7 1981); Reyes v. Wyeth Labs., 498 F. 2d 1264, 1274-1275 (CA5 1974); Davis v. Wyeth Labs., 399 F. 2d 121, 127-129 (CA9 1968); Feldman v. Lederle Labs., 97 N. J. 429, 448, 479 A. 2d 374, 384 (1984); see also Toner v. Lederle Labs., 112 Idaho 328, 336, 732 P. 2d 297, 305 (1987).

 Respondent suggests an alternative reading of the 1986 Report. According to respondent, “the principle in Comment K” is simply that of nonliability for “unavoidably unsafe” products, and thus Congress’ stated intent in the 1986 Report to apply the “principle in Comment K” to “the vaccines covered in the bill” means that Congress viewed the covered vaccines as a class to be ‘“unavoidably unsafe.’” 1986 Report 25-26; Brief for Respondent 42. The concurrence makes a similar argument. Ante, at 244-245 (opinion of Breyer, J.). This interpretation finds some support in the 1986 Report, which states that “if [injured individuals] cannot demonstrate under applicable law either that a vaccine was improperly prepared or that it was accompanied by improper directions or inadequate warnings [they] should pursue recompense in the compensation system, not the tort system.” 1986 Report 26. It also finds some support in the pre-Vaccine Act case law, which reflected considerable disagreement in the courts over “whether comment k applies to pharmaceutical products across the board or only on a case-by-case basis.” Ausness, Unavoidably Unsafe Products and Strict Products Liability: What Liability Rule Should Be Applied to the Sellers of Pharmaceutical Products? 78 Ky. L. J. 705, 708, and n. 11 (1989-1990) (collecting cases). This interpretation, however, is undermined by the fact that Congress has never directed the Food and Drug Administration (FDA) or any other federal agency to re *259 view vaccines for optimal vaccine design, see infra, at 269-270, and n. 19, and thus it seems highly unlikely that Congress intended to eliminate the traditional mechanism for such review (i. e., design defect liability), particularly given its express retention of state tort law in the Vaccine Act, see 42 U. S. C. §300aa-22(a). In any event, to the extent there is ambiguity as to how precisely Congress intended the “principle in Comment K” to apply to the covered vaccines, that ambiguity is explicitly resolved in petitioners’ favor by the 1987 House Energy and Commerce Committee Report, H. R. Rep. No. 100-391, pt. 1, pp. 690-691 (hereinafter 1987 Report). See infra this page and 260-261.

 The Third Circuit’s opinion below expressed uncertainty as to whether the 1987 Report was authored by the House Budget Committee or the House Energy and Commerce Committee. See 561 F. 3d 233, 250 (2009). As petitioners explain, although the Budget Committee compiled and issued the Report, the Energy and Commerce Committee wrote and approved the relevant language. Title IV of the 1987 Report, entitled “Committee on Energy and Commerce,” comprises “two Committee Prints approved by the Committee on Energy and Commerce for inclusion in the forthcoming reconciliation bill.” 1987 Report 377, 380.

 The majority suggests that the 1987 legislation creating the funding mechanism is akin to appropriations legislation and that giving weight to the legislative history of such legislation “would set a dangerous precedent.” Ante, at 242. The difference, of course, is that appropriations legislation ordinarily funds congressional enactments that already have operative legal effect; in contrast, operation of the tort reforms in the 1986 Act, including § 22(b)(1), was expressly conditioned on the enactment of a separate tax to fund the compensation program. See § 323(a), 100 Stat. 3784. Accordingly, this Court’s general reluctance to view appropriations legislation as modifying substantive legislation, see, e. g., TVA v. Hill, 437 U. S. 153, 190 (1978), has no bearing here.

 See 1987 Report 700 (describing the administration’s alternative proposal).

 See, e. g., Hearings on Funding of the Childhood Vaccine Program before the Subcommittee on Select Revenue Measures of the House Committee on Ways and Means, 100th Cong., 1st Sess., 85 (1987) (“[T]he liability *261 provisions of the 1986 Act should be amended to assure that manufacturers will not be found liable in the tort system if they have fully complied with applicable government regulations. In particular, manufacturers should not face liability under a ‘design defect’ theory in cases where plaintiffs challenge the decisions of public health authorities and federal regulators that the licensed vaccines are the best available way to protect children from deadly diseases” (statement of Robert B. Johnson, President, Lederle Labs. Div., American Cyanamid Co.)).

 See American Academy of Pediatrics, Questions and Answers About Vaccine Ingredients (Oct. 2008), http://www.aap.org/immunization/families/ faq/Vaceineingredients.pdf (all Internet materials as visited Feb. 18, 2011, and available in Clerk of Court's case file).

 In this manner, the “even though” clause functions in a “concessive subordinat[ing]” fashion, ante, at 235, in accord with normal grammatical usage. According to the majority, however, the “even though” clause “clarifies the word that precedes it” by “delineating] ” the conditions that make a side effect “unavoidable” under the statute. Ante, at 231. The majority’s interpretation hardly treats the clause as “concessive,” and indeed *266 strains the meaning of “even though.” In the majority’s view, proper manufacturing and labeling are the sole prerequisites that render a vaccine’s side effects unavoidable. Thus, an injurious side effect is unavoidable because the vaccine was properly prepared and labeled, not “even though” it was. The two conjunctions are not equivalent: The sentence “I am happy even though it is raining” can hardly be read to mean that “I am happy because it is raining.” In any event, the more fundamental point is that petitioners’ interpretation actually gives meaning to the words “even though,” whereas the majority concedes that its interpretation effectively reads those words entirely out of the statute. See supra this page.

 This Court, moreover, has long operated on “the assumption that the historic police powers of the States are not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.” Altria Group, Inc. v. Good, 555 U. S. 70, 77 (2008) (internal quotation marks and alteration omitted). Given the long history of state regulation of vaccines, see Brief for Petitioners 3-6, the presumption provides an additional reason not to read § 22(b)(1) as pre-empting all design defect claims, especially given Congress’ inclusion of an express saving clause in the same statutory section, see 42 U. S. C. § 300aa-22(a), and its use of the conditional “if” clause in defining the pre-emptive scope of the provision. See Bates v. Dow Agrosciences LLC, 544 U. S. 431, 449 (2005) (“In areas of traditional state regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intention clear and manifest” (internal quotation marks omitted)).

 See Collins v. Eli Lilly Co., 116 Wis. 2d 166, 197, 342 N. W. 2d 37, 52 (1984) (“We conclude that the rule embodied in comment k is too restrictive and, therefore, not commensurate with strict products liability law in Wisconsin”). Collins did, however, “recognize that in some exigent circumstances it may be neeessary to place a drug on the market before adequate testing can be done.” Ibid. It thus adopted a narrower defense (based on “exigent circumstances”) than that recognized in other jurisdictions that had expressly adopted comment k.

 See, e. g., Kearl, 172 Cal. App. 3d, at 831, n. 15, 218 Cal. Rptr., at 465, n. 15 (“[T)he unavoidably dangerous product doctrine merely exempts the product from a strict liability design defect analysis; a plaintiff remains free to pursue his design defect theory on the basis of negligence”); Toner, 112 Idaho, at 340, 732 P. 2d, at 309-310 (“The authorities universally agree that where a product is deemed unavoidably unsafe, the plaintiff is deprived of the advantage of a strict liability cause of action, but may proceed under a negligence cause of action”).

 See 42 U. S. C. §262(a)(2)(C)(i)(I) (“The Secretary shall approve a bio-logies license application ... on the basis of a demonstration that . . . the biological product that is the subject of the application is safe, pure, and potent”).

 See, e.g., Hurley v. Lederle Labs., 863 F. 2d 1173, 1177 (CA5 1988) (“[T]he FDA is a passive agency: it considers whether to approve vaccine designs only if and when manufacturers come forward with a proposal”); Jones v. Lederle Labs., 695 F. Supp. 700, 711 (EDNY 1988) (“[T]he agency takes the drugs and manufacturers as it finds them. While its goal is to oversee inoculation with the best possible vaccine, it is limited to reviewing only those drugs submitted by various manufacturers, regardless of their flaws”). Although the FDA has authority under existing regulations to revoke a manufacturer’s biologies licenses, that authority can be exercised only where (as relevant here) “[t]he licensed product is not safe and effective for all of its intended uses.” 21 CFR §601.5(b)(1)(vi) (2010); see § 600.3(p) (defining “safety” as “relative freedom from harmful effect to persons affected, directly or indirectly, by a product when prudently administered, taking into consideration the character of the product in relation to the condition of the recipient at the time”). The regulation does not authorize the FDA to revoke a biologies license for a manufacturer’s failure to adopt an optimal vaccine design in light of existing science and technology. See Conk, Is There a Design Defect in the Restatement (Third) of Torts: Products Liability? 109 Yale L. J. 1087, 1128-1129 (1999-2000) (“The FDA does not claim to review products for optimal design.... FDA review thus asks less of drug . . . manufacturers than the common law of products liability asks of other kinds of manufacturers”). At oral argument, counsel for amicus United States stated that the Centers for Disease Control and Prevention (CDC) routinely performs comparative analyses of vaccines that are already on the market. See Tr. of Oral Arg. 44-45; id., at 52-53 (describing CDC’s comparison of Sabin and Salk polio vaccines). Neither the United States nor any of the parties, however, has represented that CDC examines whether a safer alternative vaccine could have been designed given practical and scientific limits, the central inquiry in a state tort law action for design defect. CDC does not issue biologies licenses, moreover, and thus has no authority to require a manufacturer to adopt a different vaccine design.

 Indeed, we observed in Levine that the FDA is perpetually understaffed and underfunded, see 555 U. S., at 578, n. 11, and the agency has been criticized in the past for its slow response in failing to withdraw or warn about potentially dangerous products, see, e. g., L. Leveton, H. Sox, & M. Stoto, Institute of Medicine, HIV and the Blood Supply: An Analysis of Crisis Decisionmaking (1995) (criticizing FDA response to transmission of AIDS through blood supply). These practical shortcomings reinforce the conclusion that “state law offers an additional, and important, layer of consumer protection that complements FDA regulation.” Levine, 555 U. S., at 579.

 The majority mischaraeterizes my position as expressing a general “skeptictism] of pre-emption unless the congressional substitute operate[s] like the tort system.” Ante, at 240. Congress could, of course, adopt a regulatory regime that operates differently from state tort systems, and such a difference is not necessarily a reason to question Congress’ preemptive intent. In the specific context of the Vaccine Act, however, the relevant point is that this Court should not lightly assume that Congress intended sub silentio to displace a longstanding species of state tort liabil *272 ity where, as here, Congress specifically included an express saving clause preserving state law, there is a long history of state-law regulation of vaccine design, and pre-emption of state law would leave an important regulatory function — i. e., ensuring optimal vaccine design — entirely unaddressed by the congressional substitute.

 The majority’s suggestion that “vaccine manufacturers fund from their sales” the compensation program is misleading. Ante, at 239. Although the manufacturers nominally pay the tax, the amount of the tax is specifically included in the vaccine price charged to purchasers. See CDC Vaccine Price List (Feb. 15, 2011), http://www.cdc.gov/vaccines/programs/vfc/ cdc-vac-price-list.htm. Accordingly, the only way the vaccine manufacturers can be said to actually “fund” the compensation program is if the cost *273 of the excise tax has an impact on the number of vaccines sold by the vaccine manufacturer. The majority points to no evidence that the excise tax — which ordinarily amounts to 75 cents per dose, 26 U. S. C. § 4131(b)— has any impact whatsoever on the demand for vaccines.

 See Brief for United States as Amicus Curiae 28 (“Department of Justice records indicate that 99.8% of successful Compensation Program claimants have accepted their awards, forgoing any tort remedies against vaccine manufacturers”); S. Plotkin, W. Orenstein, & P. Offit, Vaccines 1673 (5th ed. 2008) (noting that “[virtually all .. . petitioners, even those who were not awarded compensation” under the compensation program, choose to accept the program's determination).

 Justice Breyer's separate concurrence is even more explicitly policy driven, reflecting his own preference for the “more expert judgment” of federal agencies over the “less expert” judgment of juries. Ante, at 247.

 Respondent notes that there are some 5,000 petitions alleging a causal link between certain vaeeines and autism spectrum disorders that are currently pending in an omnibus proceeding in the Court of Federal Claims (Vaccine Court). Brief for Respondent 56-57. According to respondent, a ruling that § 22(b)(1) does not pre-empt design defect claims could unleash a “crushing wave” of tort litigation that would bankrupt vaccine manufacturers and deplete vaccine supply. Id., at 28. This concern un *275 derlies many of the policy arguments in respondent’s brief and appears to underlie the majority and concurring opinions in this case. In the absence of any empirical data, however, the prospect of an onslaught of autism-related tort litigation by claimants denied relief by the Vaccine Court seems wholly speculative. As an initial matter, the Special Masters in the autism cases have thus far uniformly rejected the alleged causal link between vaccines and autism. See Brief for American Academy of Pediatrics et al. as Amici Curiae 20-21, n. 4 (collecting cases). To be sure, those rulings do not necessarily mean that no such causal link exists, cf. Brief for United States as Amicus Curiae 29 (noting that injuries have been added to the Vaccine Injury Table for existing vaccines), or that claimants will not ultimately be able to prove such a link in a state tort action, particularly with the added tool of civil discovery. But these rulings do highlight the substantial hurdles to recovery a claimant faces. See Schafer v. American Cyanamid Co., 20 F. 3d 1, 5 (CA1 1994) (“[A] petitioner to whom the Vaccine Court gives nothing may see no point in trying to overcome tort law’s yet more serious obstacles to recovery”). Trial courts, moreover, have considerable experience in efficiently handling and disposing of meritless products liability claims, and decades of tort litigation (including for design defect) in the prescription-drug context have not led to shortages in prescription drugs. Despite the doomsday predictions of respondent and the various amici cited by the concurrence, ante, at 248-249, the possibility of a torrent of meritless lawsuits bankrupting manufacturers and causing vaccine shortages seems remote at best. More fundamentally, whatever the merits of these policy arguments, the issue in this case is what Congress has decided, and as to that question, the text, structure, and legislative history compel the conclusion that Congress intended to leave the courthouse doors open for children who have suffered severe injuries from defectively designed vaccines. The majority’s policy-driven decision to the contrary usurps Congress’ role and deprives such vaccine-injured children of a key remedy that Congress intended them to have.